Good morning, may it please the court. Shireen Sharlick, Federal Defenders, on behalf of the appellant Brent Wilkes. In this case, at Excerpt of Record, page 201, the District Court found the government-presented testimony designed to paint Mr. Wilkes as dishonest, greedy, opportunistic, a guy without competence to handle these contracts. The District Court also said, at 211-212, that the Panama Project testimony gave him and the jury the impression that this was kind of a flyer undertaken by an opportunistic guy who didn't have the competence to handle this contract, didn't have the competence to map the Panama region, and only got this because of his connection with the congressman. After days of presenting that detailed, lengthy, and pretty unflattering portrait of Mr. Wilkes, the government excluded defense witness Williams, who would have directly contradicted that portrayal. Counsel, let me, since we've got a lot of material to cover, let me tell you, I know you allege that there are six bases upon which this would have been contradicted. I have scoured the record, and I find no contradiction. There are some things where he said some things that kind of bordered on it, but I find no direct contradiction in any of the six points. Will you please pinpoint for me where there is an exact, express, unavoidable contradiction between the two people would say? Yes, Your Honor. I actually think there are eight, but I'll start with the barcoding dispute. Joel Holmes, government witness, immunized, says, Wilkes opposed it to keep the equipment for himself. The equipment belonged to the government. Excerpt of Record 2681. Williams said, We opposed barcoding because it would disrupt the work, jeopardize deliverables, and the equipment was Wilkes's. Excerpt of Record 119-120. The Return on Investment Report. Holmes said, Okay, let's go back to the barcoding. Where is the contradiction here? Wilkes told Coombs he didn't want the equipment labeled because, in quotes, he wanted to be able to move it to other projects or anywhere. And Williams testified the barcoding problem was that the equipment belonged to ADCS and not the government, and by the government applying barcodes to that equipment, it would imply their ownership. Now, that's not a contradiction. It's an entirely different subject. No, actually, it is the same subject. Well, subject is probably the wrong word. It does not contradict what Mr. Wilkes said. Well, Combs said more than just he opposed it because he wanted to move it to other projects. He said he opposed it because he wanted to keep it for himself, and he said it belonged to the government, that the government had paid for the equipment. Williams said, actually, that the equipment belonged to Mr. Wilkes, but the government hadn't yet paid for it. And that's part of one of the other contradictions, where Combs states that Mr. Wilkes billed for equipment they didn't provide, and Williams actually says, You know what? I went back. I did an analysis on the invoices. I know that Mr. Wilkes purchased that equipment and brought it to Panama. Williams said that equipment was Mr. Wilkes'. Well, I gather your position is that Straub requires there to be a compelled immunity every time the defendant offers a witness who can say, I did not know that the defendant committed a crime, a compelled immunity. Is that correct? No, Your Honor. Absolutely not. In this particular case, though, this is not an eyewitness case where there are two people and someone pulls a gun and you can look at who pulled the gun, Straub or Adams. This is a complicated public corruption case with specific intent crimes. So, yes, the impressions, the perceptions about why my client did things were incredibly relevant. And Combs and Wade presented their impressions. If Your Honor is, I do think the bar coding dispute where Mr. Williams says, That equipment belonged to Mr. Wilkes and we opposed bar coding because it disrupted our work, is a very different impression that the jury was provided or would have been provided had Combs, you know, had they not only heard Combs' statement, he only wanted to keep it for himself. It doesn't contradict it, though, does it, counsel? I mean, you've got two different people reflecting on different things. It's the same, you know, it's the bar code, but they're talking about, you're not saying here, Combs is saying this guy's a liar. He's just talking about a different impression about the same issue, is he not? No, Your Honor. It's actually saying the equipment belonged to Wilkes or the equipment didn't belong to Wilkes, saying that Mr. Wilkes was trying to oppose a legitimate process to keep equipment for himself as opposed to prevent the disruption in work. Those are very different statements with very different impressions to be presented to a jury. And I'll move on because I do believe there are significantly additional direct contradictions. The return on investment report. Combs says, I prepared and submitted the ROI, 2650 to 2651. The government argued, if there's any question about what ROI the government paid for, in their summation, the government argued, Wilkes received 136,000 for this ROI. The government got nothing of value for this. Williams said, there was one ROI. It was a pending deliverable. When I was Panama project manager, I prepared it. I delivered it. I thought Williams and Combs were talking about two totally different documents. Williams said there was one ROI as a pending deliverable. He wasn't there when the first one was produced. But he said that there was one under the contract. The contract called for one. Is he talking about the same one that Combs is talking about? He is talking about the same one, indeed. He wasn't there. He's talking about something he produced. How would he know what Combs produced? He produced the product the government paid for. Combs may have produced some kind of plan. That wasn't what the government got in exchange for their money. And the jury was left with the impression, the jury was told by the government in summation, that was what they got. I thought Williams never saw the document. Williams saw the document when the government presented it to him. And he said this is not the ROI that was submitted to the government. This may be a plan. Oftentimes you do a plan for an ROI. This is not the ROI that we submitted. And the government did pay $136,000. But what they got were boxes of documents prepared by Williams and Price Waterhouse. The jury was led to believe they got nothing. That is indeed a direct contradiction. It is a difference. Do you admit, counsel, Judge Watford and I are struggling with the same thing here. It looks to me like they're talking about two entirely different documents. And at the time that the earlier, in quotes, ROI, which some characterize as gibberish, was submitted, Williams wasn't even there, didn't see it, didn't have anything to do with it. Well, Your Honor, the jury should have been able to decide. And the government should have been able to argue to the jury. You know what? They're two totally different things. That is actually very, very misleading, though, to let the jury believe the government did. But we're dealing with, as I understand it, what you're looking for is compelled immunity testimony here. Because you say there's a direct contradiction in what Mr. Williams said and what Mr. Wilkes or others were saying. And I just don't see it. They're talking about different documents. Now, there are eight. In your brief, you said there were six. And in each case, just like this one, I'm struggling to find where there is a contradiction. In this particular case, it seems to me they're talking about wholly different documents. They have nothing to do with each other in the sense that Williams says this about the first one. He wasn't there. He didn't prepare it. Your Honor, this issue of timing, that Williams wasn't here for this part of Joel Combs' tenure, was not an issue that the government highlighted for the jury. It's an issue that they actually, with all due respect, misled the jury about. And there were personal knowledge objections to aspects of Joel Combs' testimony. Joel Combs was not the project manager during the barcoding dispute, yet he was allowed to testify about it because the district court said, well, he says he's the Panama project manager, Excerpt from Record 2661. With respect to the ROI, Williams indeed was the person responsible. He said there was one ROI under the contract. This perception that there were two, that's a misperception that the jury bought into because they believed this two-page piece of gibberish is what the government paid $135,000 for? No wonder Mr. Wilkes was, as the government told him, gouging and engaging in fraudulent activities. Let's just say your perception is correct. Under Straub, how does what Mr. Williams had to say change that? You're asking us to compel his testimony to do what? How can he contradict what was presented to the jury in this case? He's talking about an entirely different document. What he would say is this document wasn't the final ROI that the government paid for that was called for under the contract. This was a task plan that Joel Combs was trying to pass off as the final product. Yes, that is exactly what he would have said. You know, the problem that I'm having with your arguments is the strictness of Straub. It seems to me that the Williams testimony would have been helpful. I don't think the government even disputes that. I think the testimony would have been helpful. But the direct contradiction language out of Straub is pretty demanding. And that's what we're all struggling with. Well, Your Honor, but in terms of the directness of the contradiction, Straub was not quite as concerned with timing as this court appears to be here because the question presented to the witness in Straub to Adams was, in the winter of 2003, did you have a conversation where you said I shot a man and he said no? That's a pretty broad time frame. Well, it wasn't the broadness of the time frame. It was the direct contradiction of what the non-immunized witness would have said. There was, did you say this, yes or no? I mean, it was as stark a contradiction as you could have. Well, then let me move on to, were the Department of Defense officials' concerns about pricing, performance, and inventory justified? Wade, yes. In 98, 99, and 2000. Excerpt of Record 207-1-2, 207-4, 209-8. Williams, no. Asked him the same question. The officials' concerns about pricing, performance, and inventory, were they justified? No. Excerpt of Record 121. That is a direct contradiction. And if the court has some difficulty with, well, it's kind of general, concerns justified, the government painted with that general brush when they asked Wade those three questions at Mr. Wilkes' trial. The change in focus. Wade said, Mr. Wilkes and I had a plan. We changed focus to, from supplying valuable document scanning, to this overpriced off-the-shelf computer hardware, and we did it so we could market the hardware and rip off the government. And Williams says, there was no such plan. I submitted a proposal for Mr. Wade's plan, and my, our plan had valuable document scanning services that Wade canceled. That's a direct contradiction. All right. Well, let me ask you this, because, I mean, I'm struggling, as my colleagues are, to find something that meets Straub's very strict standard for direct contradiction. But let's say that you have a handful that qualify. You still have to show that the failure to immunize Williams created a, I can't remember exactly. Distortion of the fact-finding process. Your client was deprived of a fair trial. Absolutely. I guess in the larger scheme of things, help me see where Williams' testimony, not having that, creates that distortion. Thank you, Your Honor. But right, just for one second, before we leave Straub, I do think that Straub says. No, no, that is Straub. Right, right, right. Before we leave the direct contradiction language of Straub. You're right. We're all in Straub here. Before we leave that, Straub actually says that it's inferences. It leads to an inference. Yes, they have strict language about a direct contradiction, but they also say that it just has to lead to an inference. And clearly, all of these things could have led to an inference that Williams' testimony was diametrically opposed to that of Combs and Wade. But how the fact-finding process was distorted? Three ways. First, Williams' testimony actually eliminated Mr. Wilkes' motive to bribe Congressman Cunningham. And this is how. It was the backbone of the government's case. The theory of the government's case was that Mr. Wilkes did, as they told the jury in opening, substandard work, that he was no rags-to-riches story that made his way through diligence and hard work. And this is an excerpt from Record 1163-1192. He got ahead by doing crappy work, cheating, dishonest work. He had bribed Cunningham so that these government officials would pay him and give him more work, even though he didn't deserve it. Williams entirely eliminated that motive. Williams said, we did important work, valuable work. We did all of the work. We didn't do fraudulent work. We didn't overbill. We didn't rip the government off with overpriced hardware. He eliminated the motive to bribe. But, Counsel, with respect, you're talking about two different time periods, are you not? In one case, your client's involved. In the other case, Mr. Williams is involved. They hardly overlap at all. So Mr. Williams can say what you have attributed to him, and I'm not agreeing necessarily with that, but that doesn't necessarily say anything about what your client was doing at the time that he was involved. My client was involved the entire time, Your Honor. My client was the owner of the company. My client hired Williams and put him in charge and consulted with him. I should have said that better. Your client with Coombs. Yes. Your client may have had an overarching situation, but you've got two different modus vivendi approaches by the two different people, apparently. But that doesn't necessarily exculpate your client from the first part when he had Coombs involved. But the government argued that Coombs was the Panama Project manager. The government argued that Coombs was the right-hand man to my client, managing this project and involved in this fraudulent invoicing and fraudulent overbilling. Mr. Williams actually was the real Panama Project manager. At a later point. About two months. Coombs, the Panama Project begins in July of 1998. Williams was hired in September of 1998 when Coombs was And he got there in what, November? No. Coombs, he was September of 1998. Wait, wait. Are you sure about that? Yes. That Mr. Williams became involved in September? I thought he was hired but didn't show up until about November. He was hired in September. He said very shortly thereafter, within a matter of months at most, he was running the Panama Project. That left Joel Coombs maybe from July to November at most. And the rest of the Panama Project went until 2003. And much of what went on, the barcoding, the change in focus, the billing disputes, that happened under Williams' tenure. And it was highly misleading the way this was presented. So Williams would have undercut my client's motive to bribe because the majority of the work, except for maybe a few months, which then the jury could have said, you know what, maybe Coombs was cheating and ripping off. And when they brought in Williams, you know, Mr. Wilkes, why would he replace someone who's ripping off and getting him fraudulent money with someone who's a straight shooter? That would have been a fair inference. The jury was deprived of the ability to find those facts because they didn't hear Williams. Secondly, the importance of Williams is that he undercut the two most important government witnesses, Coombs and Wade, by their own admission to Judge Urbina. And third, he corroborated Mr. Wilkes' trial testimony. Here, if you're going to present testimony that's incredibly unflattering and misleading about who's in charge of a product and what was submitted and what the government actually paid for and exclude the real Panama Project manager, exclude somebody who's not a convicted felon from saying, you know what, we didn't have a fraudulent plan. We're going to supply valuable services. We weren't overbilling. If you're going to exclude that person, then for a fundamentally fair trial, you should not get to argue that it's Mr. Wilkes alone out there. He's the only true patriot. We know he's involved in a pattern of gouging and fraudulent dealings. He's the only one denying it. You should not get to argue that. That is a distorted fact-finding process. Okay, why don't we hear from the government. You've saved about a minute, and we'll make sure you get enough chance to respond. Thank you. Thank you. If it would please the Court, Your Honors, Mr. Shorlock, Philip Halpern, Valerie Chief of the Government, let me just get right down to it. Here's the ROI. It's dated September 30, 1998. Here's the testimony of Mr. Williams. As Judge Smith correctly perceived, Mr. Williams says, he started in September of 1999, but not on the Panama Project. He had a ramp up time. He had to learn what was going on. So it took him a couple of months before he started. This is the fraudulent invoice that Joe Wilkes is talking about. Mr. Williams made it clear he had no knowledge of it, as all of this panel has seen. When we're talking about the Panama Project, we're talking in total of a handful of invoices. The government went and they showed the schedule of deliverables, which outlines the entire contract. It shows exactly what the government was presenting. Mr. Williams, have you seen this document? No. Would you have any knowledge of this document? No. Not if it wasn't here when I was doing it. It's dated, by the way, August 10, 1998. The contract that is at issue here, the invoice is September. So it is clear Mr. Williams had his chance. He looked at these documents. And what's interesting when we talk about the ROI, there's no question about what the government paid money for. It says so right on the exhibit. The $136,000 that the government talked about, it was actually $135,000 and change, is right on the invoice. It's dated. The fact of what the government is paid for is also on there. It's a two-page piece of paper which Joel Combs said, look, I didn't know what it was. It doesn't have complete sentences. Brent Wilkes told me to submit it, so I submitted it. And what's also important is that's the same piece of paper. There is no dispute about these invoices that the government received. In fact, when we looked at the testimony of the government contracting officer at a meeting that Wilkes was at but not Williams, the contracting officer said for the first time in his career, somebody burst into his office and threw invoices across the table at him and said you've got to pay these invoices. And if you don't, you're going to get a call from a congressman. And what invoices? Well, it's right in the government record. And under the testimony, he makes it clear that it's government's 2-3. This is the testimony of Paul Ference. So they're both talking about the same invoices, and these are the same invoices that Mr. Williams says he's never seen. Now that goes through every single one of his direct contradictions. And if you look to the question, and again, I think the court understands because if you take them one by one, you see they don't even rise to the level of a contradiction. Question, did ADCS, Inc. invoice the government for equipment they never purchased? Not to my knowledge. Did they try to steal government equipment they had kept for themselves? Not to my knowledge. Well, that's not surprising. He wasn't there. He didn't see it. That testimony, in fact, Judge Byrne said it's not even admissible at trial. He then allowed it in under a relaxed standard when the witness said, well, I did an audit. I looked at invoices. So it was at that point they said, okay, you looked at invoices. Did you see the fraudulent invoice? No, I haven't seen that. When he was asked the exact question about that invoice, I take it, and I'm quoting from the record, I take it you have no firsthand knowledge whether the work that was done at August 10, 1998 had, in fact, been done by that time. His response, that's correct. You didn't see the invoices that were sent out, correct? His answer, no, it was not part of the process, sir. That's right. My question to him, so you simply don't know if the work that was reflected in that invoice had been done at the time, correct? Answer, if I didn't see the invoice prior to being submitted, then I would have to say yes. So there is no dispute. You know, I have much admiration for Ms. Sharling. She's defending her client. She's doing a very good job. We're here six years after the original convention, and I would submit to the court that we're here at this point because Mr. Garagos, very able trial attorney, made a tactical decision at that time. His decision six years ago, after the government had rested, was to refuse to tell the government what the proffer of Mr. Williams' testimony would have been. So based on that refusal, the court listened to a secret proffer, where the number of immunized witnesses were misstated, where the government was not part of it in a non-adversarial process without the Stroud decision being issued. Following that, Judge Burns did indicate, yeah, I do think the testimony would counter that of immunized witnesses. Now we know because we're two years later, six years later. We're two years after the time when the defense came before this court, and again, this was an honest mistake. I don't say Ms. Sharling did anything wrong, but she argued in her last brief that virtually all of the government witnesses were immunized to this court, saying, well, we had this big problem. And now we know because Judge Burns painstakingly, and I think that's the right word, went through the entire record. He looked at all of the grand jury transcripts as well as all the trial transcripts on the relevant witnesses. He studied the briefs in his own words. He read his volume of Stroud thin. You know, the pages were thin when he finished it. And he then held a lengthy hearing that took an entire day, multiple witnesses, including much testimony from Mr. Williams. After that hearing, he made a finding, which clearly is supported by the record, that there was no direct contradiction. And, you know, in that, in his finding, it was very lengthy. I think it was approximately 50 pages long because it was a long hearing and it was clearly well thought of by the judge. But he says, quote, I find that while Mr. Williams would have supported Mr. Wolfe's testimony on that, referring to some of the fact that the work wasn't done to the standards, that, you know, the poor standards that Joe McComb said, that it was corroborative. It didn't directly contradict testimony offered by government witness. That is clearly not an abuse of discretion. Now, let me just say quickly, would it have supported the government or would it have supported Mr. Wilkes? You know, I would have to say, yes, there were parts of it that did. But you know what? I think there were parts that didn't. I frankly think as a trial attorney, as somebody who sat down there and tried the case, if they put that witness on the stand, he would have been ripped to shreds. The exact opposite would have happened because he would have been shown the invoice that was fraudulent, that went to the jury, that was thrown across the desk. And he would have said, I've never seen that one. You know, I think, frankly, it would have been worse because all of his testimony, when we look at the barcoding, which is just an opinion, but the fact of the matter is, you know, he thought Mr. Williams, ah, Brent wanted to barcode it for benignant reasons. He wanted flexibility. Collins said, no, he wanted to keep the equipment that was paid for, which again is what the non-immunized government witnesses said. But what the jury would have seen was he didn't even have a basis for that because he didn't see the invoices where the government paid for the equipment. You know, so his testimony, frankly, I'm not sure it was even admissible. So that's why I say at this point that I'm not sure it really would have even helped him. But at the end of the day, I frankly think, and again, this is six years, almost ten years of my life I've been working on this case, I look back at it and I say, hey, you know, Mr. Geragos, he was pretty sharp on this one because, frankly, I don't think he would have called him. We agreed to immunize Michael Mack, a truly precipient witness. Again, Ms. Sherlock tries to downplay him, but this is a witness who was present there when prostitutes walked in to the Hapuna suite in Hawaii, got into a hot tub with a congressman, you know, and a defense contractor, and then went upstairs. He was present when the prostitutes were ordered on the phone. He did it with Joel Combs. That's Joel Combs' testimony. They could have called him. So Mr. Williams was never charged with anything, I take it? Mr. Williams was never charged with anything. Was never charged with anything. And what was the rationale for not immunizing him at the time? This is why what Mr. Geragos did was so smart. It's like he didn't tell us the proper. We know there's a good reason why defense attorneys say, look, I want to go in camera. They do this all the time when there's damaging information they might want to get out on cross that if they tell the prosecution, they'll be able to make strategies to stop it. This was right before his direct examination. There was no reason not at that point to allow the government to be part of the proffer. In fact, the government said, look, if we're going to make a decision, we need to be part of the proffer. That's why we didn't. It was a mistake. Seeing his testimony, we should have done it. You know, I don't want to make too much of it. I'm not sure I fully understand the answer. Did the government ever intend to prosecute Mr. Williams? The government intend. Mr. Williams was one of a number of individuals who the government suspected there might be evidence against. We charged in relation to this case, I think, five individuals, you know, related. There was Mr. Wilkes was charged. Congressman Cunningham was charged. Tommy Contagionis was charged. John Michael was charged. Who am I missing? I'm missing one. And we didn't charge a number of others. We didn't charge Joel Combs. He got immunity. Would we have charged Mr. Williams, who did come into the number two position? Well, the information we had at that time, if we had a proffer, we might have said, hey, well, you know, I don't think we would have charged him. But we didn't know. We take our obligation seriously. Judge Watford, you know, granting of immunity, it's not like candy at Halloween. It's, yes, I would say it's the trial team's decision. In many respects, it was my decision here that I had to share and get concurrence with Mr. Forge, Ms. Chu, and Mr. Bondari about. But I was tasked to do it. And I gave all of my notes on this to Judge Burns just so he could see. I mean, it was a request by Ms. Charlock, you know, at the hearing. And I said, I don't know if Jenks applies. But, again, I'm in that same district. I've been in that district almost 30 years now. I've never had any issues with the court. I tend, and I think it's a good policy, you know, you turn over everything. If there's something you don't turn over, you know what it is. But prosecutors, these are hard, especially, I don't work in the gang area. I don't have a lot of concerns. They do. But I said to Ms. Charlock at the time, and she'll recall, okay, yeah, I think he's testifying. If there's Brady, if there's Jenks, I'll turn it over. And I think she called me on a Friday night, you know, before a Monday hearing. But I spent the weekend. I found everything I could. And I turned it over in camera to the judge. And I think what's clear is, and Judge Burns saw it, you know, we're struggling. We have to make this decision. I have to pass it up the chain to the U.S. attorney. She signs off. It goes to an assistant attorney general. It goes to the judge. Before I do that, I weigh it carefully. Do we get it always right? No. We try our best. And if, in fact, he gave any type of proffer 18 months ago, I wanted his testimony. I wanted to make a decision. You know, that's the very essence of the prosecutorial function. We meet with defense attorneys. We look and we decide what is the right thing to do for the government. Should we give immunity? Should we try to charge him? Well, Mr. Williams was in that number area where he was the number two person afterwards. And I should say, by the way, it's even nuanced then. As you can see, he wasn't around when this happened. But his testimony also, and I think it's in SCR 139, he indicates that he left the company in 2002 to go to work for Perfect Wave. So in much of what happened with Mr. Wade's testimony, all the deliverables that are so-called, this change of focus. Well, the change of focus happened in 2003. That's when those contracts were deliverable. This change of focus, the delivery date on that, I've gotten rid of that. It was in 2004 sometime. I think it was June of 2004. Well after. So he wasn't, you know, when we look at that, he wasn't in either side. And again, I respect what the defense is doing here. The appellant is trying to shoehorn Harfax into Stroud. If we look at the original proffer, you know, it was very small having to do with Wade. And as I said, I mean, nothing to do with Wade. That came on afterwards when it was, uh-oh, how do I fit myself into Stroud? And I think they did what all good defense attorneys do, and they said, well, it also contradicted Wade. But the fact is I think timing-wise didn't contradict Combs, and it doesn't contradict Wade either, even if you assume Wade's is more than just opinion. This is not directly relevant in any way to our decision, but can you just remind me the timing of when our court granted bail to Mr. Wilkes? Oh, yeah. That's a sore subject. What did you say in response that allowed that to happen? Well, I think if there's an error. I tend to think the error falls on the government, especially when I'm in front of a court. But, you know, and I think Judge Burns made a mistake, but the fact is the government didn't inform him of what the right standard was, you know, in terms of what would happen if he did not put Mr. Wilkes in custody originally. And he didn't. He allowed Mr. Wilkes to stay out on bond, making a finding. Look, he's no danger. We argued he was a danger, but he said, no, he's no danger. I'm not buying your economic danger argument. Fine, so be it. I'm going to leave him out. So he left him out until it was time for sentencing. And then he remanded him. But he did at that point, he said, however, Mr. Wilkes, you want to appeal? I'll leave you out. I'll give you a couple days, I believe, whatever it was, three or four days. And at that time, they filed an appeal. He was out on custody. The ruling was he was no flight risk. Under the Ninth Circuit rules, as I understand them pretty much, and I'm not an expert on this, but the commissioner who handled most of this originally maintained the status quo, which was he was out in custody. If he had said, I'm not giving you until next Friday, I'm putting you in today. Now, I say, again, I'm guessing. Judge Burns, he'll let me know sometime from the bench if I'm right or wrong. But I'm guessing and I'm thinking, he said, boy, I should have put him in the same day. But, again, it's my job as the prosecutor. I certainly should have been in a position to say to him, I've been around I think a little longer than Judge Burns, and I should have said, hey, this might be a mistake. Because from that point on, Judge Burns and the government made a series of rulings that were contesting Mr. Wilkes being out on bond, including later findings about fraud that ---- I don't want to get us too far. Okay. It's not relevant. I just was curious. Well. We have the state of affairs we have. I appreciate it. And it's unfortunate. And it might just be a problem with the rules, because I do think this is one of those instances. We're talking about the largest congressional bribery case in history. And, you know, I'm asked all the time, it's how many years, and the guy is not in jail? Congressman Cunningham has served an eight-year sentence, and he's out, and the guy bribing him. And I don't like that. That's unfortunate. And I just think, you know, if he's innocent, if he needs a new trial, so be it. But at this point, I think it was just the court's procedural rules, and I apologize for that. I've gone on way long without any questions. If the court has none, I've taken up a lot of your time. I won't ---- okay? Thank you. We've got a minute left. Why don't we give you two? Thank you. Super quick aside, this court granted my client bail pending appeal two times. It was Judge Kaczynski who actually signed the order, not because of some status quo, because he found that this appeal presented a substantial question. And the government, on a couple of factual matters, Mr. Williams, at excerpt of record page 139, in 06, 06, not 03, giving him plenty of time to talk about the concerns of officials and the Wade subcontract, a critical direct contradiction, as I see it. Also, he started in September 98, not 99, as the government said, and that's at excerpt of record 107. More importantly, he said there could be no fraudulent invoices. He didn't need to see the invoices. This is a firm, fixed-price contract. All the work was done. There was no fraud. According to the way the government reads Straub, no other case could ever satisfy it. This has to be this one circumstance, this one eyewitness, did someone brandish a gun and shoot somebody or not? Straub's a due process, published decision of this court. It's got to have application to a complicated public corruption, white-collar fraud case that depends upon specific intent. And those types of issues do depend upon perceptions and impressions, especially in a circumstantial case. And there are, they do lead to inferences of direct contradiction. And that is something that Straub allows for. My client here seeks a fundamentally fair trial. That is what he is asking. And in this case, it wasn't fundamentally fair to present an incredibly inaccurate, negative portrayal of Mr. Wilkes and completely exclude the real Panama project manager, the real man who drafted real work that the government paid for, and then argue about it. Okay. Thank you. Thank both sides for their arguments. The United States v. Wilkes now submitted for decision.
judges: Fletcher, Smith, Watford